

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Tennessee
### Chattanooga Division

Jeffry Thul,

                Plaintiff,

    vs.

Debra Haaland Secretary,
Department of Interior,

                Defendant.

Civil Action No. 1:23-cv-165 TRM

**Reasonable Accommodation for SICL Hearing Requested**

---

## COMPLAINT OF DISCRIMINATION AND
## AGENCY NON-COMPLIANCE

**COMES NOW** Plaintiff, Mr. Jeffry Thul (hereinafter "Plaintiff"), *pro se*, who brings this action against the United States of America; U.S. Department of the Interior (DOI); National Park Service ("NPS"). This is action is brought for discrimination in employment pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*., Section 501, 29 U.S.C. § 794, in particular ("Rehabilitation Act"). Additionally, pursuant to the Administrative Procedures Act, codified 5 U.S.C. §§ 551–559, ("APA"), Mr. Thul is also requesting this Court compel agency action unlawfully withheld or unreasonably delayed relating to the Department of Interior's March 11, 2021 final action in his case no.: NPS-20-0382.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction of the Rehabilitation Act action pursuant to 42 U.S.

Code § 2000e–5(f)(3), and the APA action pursuant to 5 U.S.C. §702, 28 U.S.C. §§ 1331 and,

2201.

2.     Venue is proper in Hamilton County pursuant to 28 U.S.C. § 1391(b)(2). The

substantial part of the events, or omissions giving rise to the claim occurred in Ooltewah, TN

which is within Hamilton County.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

3.     Plaintiff certifies that he has exhausted all available administrative procedures

through the EEO Commission, and the Agency EEO administrative process in an attempt to

resolve this complaint.

**Rehabilitation Act**

4.     On May 25, 2023, Plaintiff received his Rehabilitation Act, Notice of Right to

File a Civil Action, in Case No.: NPS-18-0571. (Ex. A, Right to File, pp. 13-15)

5.     The relevant and material allegations made in this complaint are well-supported

by the documentary evidence provided in NPS Case Nos.: 18-0033, 18-0571, and 20-0382

administrative records (ROI). An electronic copy can be made available upon request.

**Administrative Procedures Act**

6.     On March 11, 2021, Plaintiff received the U.S. Department of the Interior (DOI or

Agency), Office of Diversity, Inclusion and Civil Rights (ODICR) Final Agency Action (FAD),

Agency Case No.: NPS-20-0382 Final Agency Action.

ODICR finds that you **have** been subjected to disparate treatment and denial of
reasonable accommodation based only on disability (mental), in violation of the
Rehabilitation Act, when on September 17, 2019, the Assistant Regional Director,

Administration (RMO2) issued to Complainant a non-disciplinary removal for inability to perform the duties of his position..

7.　　　　The relevant and material findings made by the DOI are provided in the Department's FAD attached herein. (Ex. A, ODICR Final Agency Action, pp. 16-49)

## I.  The Parties to this Complaint

### A.  The Plaintiff

8.　　　　Mr. Jeffry Thul is a psychologically disabled federal employee who is receiving Federal Employee Compensation Act (FECA) directed compensatory payments. Circa. Spring 2018, both, Mr. Thul's treating psychiatrist, Dr. Marie Beasley, as well as his Office of Workers' Compensation Program (OWCP) second-opinion psychiatrist, Dr. Manju, updated the OWCP that Mr. Thul's psychological injuries were *short-term* and that he was p*artially recovered.*

### B. Defendants

9.　　　　Mr. Brad Bennett, NPS, SERO, Chickamauga and Chattanooga National Military Park, Superintendent (hereinafter "Defendant Bennett.") Defendant Bennett is alleged to have created a Hostile Work Environment that was medically described to be "distracting from [Mr. Thul's] treatment . . . traumatic by nature . . . and dysfunctional." On February 8, 2018, pursuant to Director's Order 50A, Defendant Bennett began approving Mr. Thul's OWCP wage loss forms. Bennett was the proposing official in Mr. Thul's unlawful termination. The DOI determined Defendant Bennett's motivation was retaliatory.

10.　　　　Mr. Ed Buskirk, NPS, Southeast Regional Office (SERO), Associate Regional Director for Administration, (hereinafter "Defendant Buskirk."). Defendant Buskirk is alleged to have knowledge that beginning July 2017, Defendant Bennett had created a discriminatory threatening Hostile Work Environment. Buskirk never reported or investigated Mr. Thul's

allegations. On September 17, 2019, Defendant Buskirk terminated Mr. Thul for, "Inability to Perform Functions of Position." On March 11, 2021, the DOI found Buskirk's termination violated the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. III 1979). The DOI determined Defendant Buskirk's motivation was also retaliatory.

## STATEMENT OF THE CASE

On March 11, 2021 the DOI released their findings that Mr. Thul's termination from federal service was based only on his disability in violation of the Rehabilitation Act.

Mr. Thul disagrees contending that while it was discriminatory, it was based on a pattern of the same repeated unlawful employment practices. Mr. Thul alleging deliberate indifference in the Rehabilitation Act context. In this instant matter, the ODICR never determined whether "the defendants *knew* that the discriminatory termination violated Mr. Thul's substantive rights with regard to restoration set forth at 5 C.F.R. § 353.30l(d) … and they *failed* to act on that likelihood."

## GOOD FAITH AND COMPENSATORY LIABILITY PHASE

### Supreme Court Precedent

"Our conclusion with respect to the incidents that may be considered for the purposes of liability is reinforced by the fact that the statute in no way bars a plaintiff from recovering damages for that portion of the hostile environment that falls outside the period for filing a timely charge. *Morgan* correctly notes that the timeliness requirement does not dictate the amount of recoverable damages. It is but one in a series of provisions requiring that the parties take action within specified time periods, see, *e. g.*, §§ 2000e—5(b), (c), (d), none of which function as specific limitations on damages."

*National Railroad Passenger Corporation v. Morgan,* 536 US 101, 119 (2002)

### Agency Period of Liability

Mr. Thul's NPS 18-0571 Prayer for Relief requests damages for the portion of the hostile environment that was **DISMISSED WITHOUT PREJUDICE.** Left standing within 18-0571 period of liability is the Plaintiff's discriminatory termination, and claims that are sufficiently related to the Plaintiff's termination, incidents that fall within and outside the statutory period or are part of a systematic policy or practice of discrimination that took place, at least in part, within the NPS-18-0571 limitations period.

**RIGHT TO FILE NPS CASE NO.: DOI-NPS-18-0571**

**Claim** accepted for investigation:

> Whether the Complainant was discriminated against on the basis of disability (mental) and reprisal (prior EEO Activity: December 11, 2017 – NPS-18-0033) when in June 2018, management denied the Complainant's requests for a reasonable accommodation to be relocated away from the park.

Mr. Thul's RTF in DOI Case No. NPS-18-0571 opens the door for a determination if Bennett's alleged April 30, 2108 failure to accommodate Mr. Thul's request to be relocated is connected to Bennett's September 17, 2019 discriminatory termination, and a part of the ongoing violations of Mr. Thul's substantive rights with regard to restoration.

**FEDERAL QUESTION OF LAW**

> Whether the Commission's NPS-18-0571 ALJ findings that the Agency's failure to relocate Mr. Thul was **NOT** a violation of Mr. Thul's substantive rights afforded to him by 5 C.F.R. § 353.301(d)?

**MATERIAL FACTS**

11.    There is no dispute Mr. Thul is a federal employee who was injured in the line of duty and is currently receiving OWCP compensatory payments for said injury.

12.     At all times during the period of alleged discriminatory misconduct, Mr. Thul's position as the Park's Supervisory Facility Operations Specialist, GS-1640-12 remained open and available.

13.     On June 19, 2017 the Agency received Mr. Thul's Hostile Work Environment complaint.

14.     On July 11, 2017, the Agency responded by charging Mr. Thul with misconduct.

15.     On July 21, 2017 Mr. Thul left the Park seeking treatment for his line-of-duty caused illness.

16.     On August 31, 2017 the Agency received knowledge of Mr. Thul's HWE allegations against his supervisor, Bennett, and took no action.

17.     On September 11, 2017, the Agency was provided with the awareness of fact that the Plaintiff's occupational disease was identified as *short-term*. Plaintiff's psychiatrist, Dr. Beasley notified the Agency that Mr. Thul was *partially recovered* and anticipating a return to duty *January 2018*.

18.     On November 16, 2017 both the Agency and the CP received knowledge the OWCP accepted Complainant's claim for PTSD.

19.     Under OPM's regulations, such employees have different substantive rights based on whether they have fully recovered, partially recovered, or are physically disqualified from their former or equivalent positions. 5 C.F.R. § 353.301.

20.     On November 16, 2017, Plaintiff's substantive rights with regard to restoration were set forth at 5 C.F.R. § 353.30l(d), and the Director of the NPS' Standing General Order 50A, Worker's Compensation Case Management (March 30, 1998).

21.     *Partially recovered* individual's substantive rights with regard to restoration are

set forth at 5 C.F.R. § 353.30l(d) which provides as follows:

> Agencies **must** (emphasis added) make every effort to restore in the local
> commuting area, according to the circumstances in each case, an individual who
> has partially recovered from a compensable injury and who is able to return to
> limited duty. At a minimum, this would mean treating these employees
> substantially the same as other handicapped individuals under the Rehabilitation
> Act of 1973, 29 U.S.C. § 794 (Supp. III 1979).

22.     *Partially recovered* individual's substantive rights with regard to restoration are

set forth in Director's Order 50A, Workers' Compensation Case Management which provides as

follows:

> Director's Order #50 focuses only on workers' compensation case management,
> which deals with employees who are unable to perform the full range of their
> regular duties due to work-related injury or occupational illness. It is one in a
> series of policy and procedural actions intended to reduce drastically the NPS's
> loss of time and money due to injuries and illnesses. *Short-term* case management
> applies to employees who are expected to return to the workforce at their regular
> job within 1 year. The NPS has primary responsibility for *short-term* case
> management.

23.     On September 22, 2017, the Agency failed in their legal responsibilities when, for

a third time, they refused Mr. Thul's reasonable accommodation request for an investigation into

his allegations Bennett was perpetuating a hostile work environment.

24.     On February 8, 2018, the Agency began approving Mr. Thul's OWCP CA-7,

wage-replacement approval documents under FECA.

25.     The circumstances in this case: Buskirk's refusal to resolve the HWE.

26.     The circumstances in this case: Bennett's refusal to grant Mr. Thul access to the

procedures outlined in Director's Order 50A, Office of Workers' Compensation Case

Management.

27.    The Agency's affirmative action program Director's Standing General Order 16E, NPS Anti-Harassment Policy provided Buskirk with the *non-discretionary* duty to either separate Bennett from Mr. Thul or relocate Mr. Thul until the HWE was resolved.

28.    On April 30, 2018, the Agency received the Plaintiff's medical update. The Complainant's treating psychiatrist Dr. Marie Beasley providing Bennett with the awareness of fact that,

> "[h]is symptoms are directly related to his experiencing being a first responder to a suicide that happened at the park where he was working in early 2017. Secondarily, he is also navigating an issue involving a hostile work environment complaint. Each time that the work environment complaint is further delayed in being resolved sets him back tremendously in his PTSD recovery, despite his compliance with treatment recommendations. This process of having to reiterate his complaint is both distracting from his treatment and traumatic by nature….it is imperative that he be given a position in another facility while he continues to work towards healing from the trauma."

29.    On May 1, 2018, the Agency initiated action to have Mr. Thul, at his own expense, be permanently relocated outside the local commuting area, according to the circumstances in this case.

30.    On June 4, 2018 Plaintiff filed complaint NPS-18-0571.

**Case No. NPS-18-0571 Claim**

> Whether the Complainant was discriminated against on the basis of disability (mental) and reprisal (prior EEO Activity: December 11, 2017 – NPS-18-0033) when in June 2018, management denied the Complainant's requests for a reasonable accommodation to be relocated away from the park.

31.    On May 13, 2019 the Agency received Mr. Thul's first reasonable accommodation request to be returned to duty.

32.    June 6, 2019 Defendant Bennett proposed Mr. Thul's termination.

33.     On August 2, 2019 the Agency received Plaintiff's second reasonable accommodation request to return to duty.

34.     On September 17, 2019 the Assistant Regional Director, Administration, Mr. Ed Buskirk terminated the Complainant's federal employment for inability to perform duties.

35.     On March 11, 2021, the DOI ODICR issued their final action finding the termination was based solely on Plaintiff's disability in violation of the Rehabilitation Act.

36.     On May 3, 2021, the EEO Commission, case no.: NPS-18-0571 ALJ found the Agency's refusal to relocate Mr. Thul did **NOT** violate 5 C.F.R. § 353.30l(d). Plaintiff timely appealed to the Commission.

37.     On May 25, 2023, the Commission issued their final action, "The decision in EEOC Appeal No. 2021003662 remains the Commission's decision." Plaintiff received his Rehabilitation Act, Notice of Right to File a Civil Action, in Case No.: NPS-18-0571.

**CONCLUSION**

This case is to determine if the Commission's ALJ's decision was correct.  If not, Plaintiff establishes the NPS-18-0571 statutory time period starts on June 4, 2018 when the Plaintiff filed complaint and stopped on May 25, 2023 when the Commission took final action. For the purpose of liability only, Mr. Thul is requesting damages for that portion of the hostile environment that falls outside this period. Tolling should begin September 22, 2017 and run through May 25, 2023, or as determined by law.

**PLAINTIFF'S CLAIMS FOR WHICH RELIEF IS SOUGHT**

**Count 1**
Agency Non-Compliance
Violation of the Administrative Procedures Act

38.     The APA provides for judicial review of final agency action.

39.     The reviewing court must either "compel agency action unlawfully withheld or unreasonably delayed," or "hold unlawful and set aside agency action, findings, and conclusions" that violate any one of six factors. 5 U.S.C. § 706.

40.     Plaintiff suffered damages and injuries.

**Count 2**
Hostile Work Environment
Agency "Continuing Violations"
Violation of the Rehabilitation Act

41.     Plaintiff's substantive rights are set forth in 5 C.F.R. § 353.30l(d).

42.     Plaintiff alleges Agency HWE violations involved the continuing policy of deliberate indifference from September 22, 2017 through May 25, 2023, and beyond.

43.     The action taken by these Policymakers was in violation of the Plaintiff's clearly established Federal constitution and statutory rights.

44.     Plaintiff suffered damages and injuries.

**Count 3**
Deliberate Indifference
Failure to Provide Reasonable Accommodations
Violation of the Rehabilitation Act

45.     Plaintiff's substantive rights are set forth in 5 C.F.R. § 353.30l(d).

46.     Complainant is a qualified individual with a disability.

47.     Defendants were prohibited from engaging in discrimination that prevented Mr. Thul from being restored in the local area.

48.     Mr. Thul's position in the local area was open.

49.     Based on a HWE that was medically described as, "distracting from Mr. Thul's treatment and traumatic by nature" Mr. Thul reasonably requested to be temporarily relocated per DO-16E guidance.

50.     Defendant's denied his reasonable accommodation request.

51.     Defendants terminated his federal employment.

52.     Defendants never engaged in an interactive process.

53.     Plaintiff suffered damages and injuries.

---

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in favor of Plaintiff and against Defendants and award the following relief:

(a)     Appropriate back pay relief, including annual incremental promotional steps beginning September 22, 2017 to the professional pay grade he would have been in his professional career had the Agency not acted with deliberate indifference, causing injury;

(b)     Appropriate front pay relief, at that professional pay grade until Plaintiff reaches the age of 70;

(c)     Retirement at the age of 70 based on a hi-three average established at that proper pay grade and step level, with time in grade inclusive of the period lost due to the Agency's discrimination;

(d)     Pecuniary damages associated with lost TSP contributions; leave accrual; payment of back pay with interest, pension, restoration of time lost while on OWCP roles;

(e)     Any and all collateral source payments owed relating to OWCP benefit payments; third-party claims, medical related travel, medicine; future psychological treatment as allowed and to be determined;

(f)     Rehabilitation Act non-pecuniary statutory max $300,000.00;

(g)     Pre and post-judgment interest at the highest lawful rate;

(h)   Any such further relief as this Court deems appropriate.

**Damage Total: As allowed by law**

**Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted,

Jeffry Thul, pro se
PO Box 1403
Dayton, TN 37321
Tel No.:  (423) 774-8440
E-mail:  jeffrythul@gmail.com



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 77960
Washington, DC 20013

Jeffry Thul, a/k/a
Clinton C.,[1]
Complainant,

v.

Deb A. Haaland,
Secretary,
Department of the Interior,
(National Park Service),
Agency.

Request No. 2023001155

Appeal No. 2021003662

Agency No. NPS-18-0571

Hearing No. 490-2019-00157X

DECISION ON REQUEST FOR RECONSIDERATION

Complainant timely requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in Clinton C. v. Department of the Interior, EEOC Appeal No. 2021003662 (November 9, 2022). EEOC regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

During the relevant time, Complainant worked for the Agency as a Supervisory Facility Operations Specialist at the Chickamauga and Chattanooga National Military Park in Fort Oglethorpe, Georgia.

On October 5, 2018, Complainant filed a formal complaint claiming discrimination based on disability and in reprisal for prior protected activity when, in June 2018, management denied his requests for a reasonable accommodation to be located away from the park.

After an investigation, Complainant requested a hearing before an EEOC Administrative Judge (AJ). The assigned AJ issued a summary judgment decision, concluding no discrimination or unlawful retaliation was established. Thereafter, the Agency issued a final action implementing the AJ's decision. In EEOC Appeal No. 2021003662, the Commission affirmed the Agency's final action implementing the AJ's summary judgment decision.

We have reviewed Complainant's arguments in the instant request for reconsideration. The arguments raised in the instant request either were made, or could have been made, below. Complainant has provided no persuasive reason to disturb the Commission's prior decision. A request for reconsideration is not a second appeal to the Commission. Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), Chap. 9 § VI.A (Aug. 5, 2015); see, e.g., Lopez v. Dep't of Agric., EEOC Request No. 0520070736 (Aug. 20, 2007). Rather, a reconsideration request is an opportunity to demonstrate that the appellate decision involved a clearly erroneous interpretation of material fact or law, or will have a substantial impact on the policies, practices, or operations of the Agency. Complainant has not done so here.

After reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 2021003662 remains the Commission's decision. There is no further right of administrative appeal on the decision of the Commission on this request.[2]

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.

---

[2] Because we have denied the request for reconsideration, we find it unnecessary to address the Agency's appellate argument that the request should be dismissed because Complainant has addressed the subject claim in a civil action filed in a United States District Court.

Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

<u>RIGHT TO REQUEST COUNSEL</u> (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

<u>May 25, 2023</u>
Date



United States Department of the Interior

OFFICE OF THE SECRETARY

OFFICE OF DIVERSITY, INCLUSION AND CIVIL RIGHTS

Washington, D.C. 20240

TRANSMITTAL VIA ELECTRONIC MAIL

JeffryThul@gmail.com

Jeffry Thul
9509 Balata Drive
Ooltewah, Tennessee, 37363

     Subject:     Final Agency Decision
                   *Jeffry Thul v. David Bernhardt, Secretary, U.S. Department of the Interior*
                   Agency Case No. DOI-NPS-20-0382

Dear Jeffry Thul:

After careful review and analysis of your Equal Employment Opportunity (EEO) complaint and the Report of Investigation (ROI), the U.S. Department of the Interior (DOI or Agency), Office of Diversity, Inclusion and Civil Rights (ODICR) takes final action on your complaint by issuing this Final Agency Decision (FAD).

ODICR finds that you **have not** been subjected to disparate treatment based on reprisal (Agency Case Nos. DOI-NPS-18-0033, DOI-NPS-18-0571) as alleged under Title VII of the Civil Rights Act of 1964.

ODICR finds that you **have** been subjected to disparate treatment and denial of reasonable accommodation based only on disability (mental), in violation of the Rehabilitation Act.

## I.    <u>Statement of the Claims</u>

Whether Jeffry Thul (Complainant) has been subjected to disparate treatment on the bases of disability (mental) and reprisal (Agency Case Nos. DOI-NPS-18-0033, DOI-NPS-18-0571) when on September 17, 2019,[1] the Assistant Regional Director, Administration (RMO2) issued to Complainant a non-disciplinary removal for inability to perform the duties of his position.

---

[1] The Notice of Acceptance originally misidentified the date of Complainant's removal as September 13, 2019. ROI, Ex. C-1, p. 107. However, September 13, 2019, is the date that Complainant received the Non-disciplinary Removal Decision for Inability to Perform Duties of Your Position ("Removal Decision"), which became effective on September 17, 2019. ROI, Ex. F-9, p. 218.

## II.    Procedural History

On September 23, 2019, Complainant made initial contact with the EEO Counselor. ROI, Ex. B, p. 65. On December 18, 2019, Complainant participated in an initial interview with the EEO Counselor. ROI, Ex. B, p. 65. The EEO Counselor sought to resolve Complainant's allegations to no avail. ROI, Ex. B, p. 70. On May 13, 2020, the EEO Counselor issued to Complainant a Notice of Final Interview and a Notice of Right to File a Formal Complaint of Discrimination (NORTF). ROI, Ex. B, p. 80. On May 22, 2020, Complainant acknowledged receipt of the NORTF via signature. ROI, Ex. B, p. 82. On May 22, 2020, Complainant filed this formal complaint, pursuant to the Rehabilitation Act and Title VII of the Civil Rights Act of 1964. ROI, Ex. A, p. 16.

On June 3, 2020, the Agency acknowledged receipt of Complainant's formal complaint in a Notice of Acknowledgement. ROI, Ex. C-1, p. 104. On June 5, 2020, the Agency accepted Complainant's claims in a Notice of Acceptance, pursuant to the Equal Employment Opportunity Commission's (EEOC's) Regulations found in Title 29 Code of Federal Regulations (29 C.F.R.), § 1614. ROI, Ex. C-1, p. 107.

On June 19, 2020, the Agency ordered a formal investigation, which was conducted through July 28, 2020. ROI, Ex. G-3, p. 282.

On September 8, 2020, the Agency emailed Complainant the ROI, which included the investigative summary and a notice of rights. The Agency notified Complainant that there is no right to request a hearing before the EEOC, as this case is a "Mixed Case complaint" appealable to the Merit Systems Protection Board (MSPB). This FAD thus issues in accordance with 29 C.F.R. § 1614.302(d)(2).

## III.    Statement of the Facts

Whether Complainant has been subjected to disparate treatment on the bases of disability (mental) and reprisal (Agency Case Nos. DOI-NPS-18-0033, DOI-NPS-18-0571) when:

1.      For the five years[2] leading up until September 17, 2019, Complainant was a GS-1640-12 Supervisory Facility Operations Specialist with the Chickamauga and Chattanooga Military Park ("Park") in Chattanooga, Tennessee. ROI, Ex. F-1, p. 114.

2.      In his role as Supervisory Facility Operations Specialist, Complainant was responsible for making and implementing decisions affecting the Park's management, policy, and operations; complying with federal and state regulations, including building codes; and managing a comprehensive safety and training program. ROI, Ex. F-1, p. 115. The essential functions of his position also included monitoring and evaluating maintenance programs; performing and maintaining asset inventories and condition assessments; developing and implementing projects, including facility modifications; and managing construction processes. ROI, Ex. F-7, p. 206.

---

[2] The ROI does not contain Complainant's exact start date for his position of record.

3.      Complainant self-identified as being disabled due to his Chronic Post-Traumatic Stress Disorder (PTSD) and Unspecified Depressive Disorder ("depression"). ROI, Ex. F-1, p. 116. Complainant's psychological impairments included: reduced object recall, a short attention span, limited concentration, decreased focus on tasks, psychomotor retardation, hyperdistractability and hyperactivity, avoidance, hyperarousal, depressed mood, moderate anxiety, and passive suicidal ideation. ROI, Ex. F-1, p. 117. Complainant's physical impairments included: symptoms of tiredness, decreased energy, occasional crying spells, and significant weight loss of 30 pounds in four months. ROI, Ex. F-1, p. 117.

4.      Complainant's prior EEO activity included Agency Case Nos. DOI-NPS-18-0033 (formal complaint filed December 11, 2017), and DOI-NPS-18-0571 (formal complaint filed October 18, 2018), as well as his reasonable accommodation requests related to his PTSD and depression. ROI, Ex. F-1, p. 118.

5.      At all times relevant to this complaint, Complainant's first-level supervisor was the GS-14 Superintendent (RMO1) at the Park. ROI, Ex. F-1, p. 116. RMO1 learned of Complainant's medical conditions in August[3] of 2017, when Complainant provided Park management with medical documentation of his diagnosis. ROI, Ex. F-3, p. 164. RMO1 learned of Complainant's prior EEO activity when he was interviewed as a witness and RMO for Complainant's previous EEO complaints in October of 2017, February of 2018, and April of 2019. ROI, Ex. F-3, p. 166.

6.      The deciding official on Complainant's removal was the Associate Regional Director, Administration (RMO2), in Atlanta, Georgia. ROI, Ex. F-2, p. 144. RMO2 claimed that he learned of Complainant's medical conditions in spring of 2019. ROI, Ex. F-2, pp. 145-146. Although RMO2 was not in Complainant's chain of command, his supervisor was RMO3, Complainant's third-level supervisor. ROI, Ex. F-2, p. 145. In his prior formal EEO complaints, Complainant had accused RMO2 of committing misconduct, mismanagement, and unethical behavior. ROI, Ex. F-1, p. 123. RMO2 stated that he learned of Complainant's prior EEO activity in spring of 2019, when he was interviewed as a witness regarding a separate denial of reasonable accommodation claim. ROI, Ex. F-2, p. 147.

7.      On January 26, 2017, Complainant was the first responder in a January 2017 active shooting where a visitor committed suicide in the men's restroom at the Park. ROI, Ex. F-1, p. 116; Ex. G-4, p. 305. Complainant submitted extensive medical documentation stating that the January 2017 active shooting incident directly caused his PTSD and depression, although he did not receive official diagnoses until July 2017. ROI, Ex. F-1, p. 116; Ex. F-10, p. 236.

8.      Complainant stated that on July 21, 2017, he "left the Park in extreme psychological distress" after experiencing a PTSD-related breakdown. ROI, Ex. G-4, p. 305. The next business day, July 24, 2017, was the last day that Complainant worked in an on-duty status. ROI, Ex. F-9, p. 219; Ex. G-4, p. 305.

---

[3] There is evidence that Complainant provided the Agency with medical documentation related to his diagnoses in July of 2017, but it is unclear when RMO1 received that documentation. ROI, Ex. G-4, pp. 305-306; Ex. F-3, p. 167; Ex. F-9, p. 219.

3

9.      On July 25, 2017, Complainant received an official diagnosis of PTSD and depression, and provided the Agency with that documentation. ROI, Ex. G-4, pp. 305-306; Ex. F-3, p. 167. On August 7, 2017, Complainant submitted a Family and Medical Leave Act (FMLA) request to the Agency requesting short-term disability leave from July 25, 2017 through September 15, 2017. ROI, Ex. G-4, p. 306. On November 16, 2017, Complainant also provided the Agency with documentation for his Department of Labor Office of Worker Compensation Programs (OWCP) claim for PTSD. ROI, Ex. G-4, p. 309.

10.     Complainant submitted additional FMLA documentation requesting extensions to his short-term disability leave on: September 11, 2017; October 13, 2017; December 8, 2017; January 25, 2018; March 14, 2018; April 4, 2018; and April 13, 2018. ROI, Ex. G-4, pp. 307-314.

11.     During this time, Park management filled Complainant's position on a temporary basis. ROI, Ex. F-3, p. 166.

12.     In May of 2018,[4] Complainant provided the Agency with updated medical documentation affirming his continued medical inability to return to his position at the Park and requesting reassignment to a different position as a reasonable accommodation. ROI, Ex. F-10, p. 229; Ex. F-3, p. 167. RMO1 recalled receiving this request. ROI, Ex. F-3, p. 167.

13.     The ROI for Complainant's previous EEO complaint, Agency Case No. DOI-NPS-18-0571 (PROI) contained a May 11, 2018 Medical Documentation Employee Questionnaire for Reassignment from Complainant. PROI, Ex. F-10, p. 525-527. According to the Questionnaire, Complainant sought to be reassigned into an equivalent position at another park within the local commuting area of his home in Chattanooga, Tennessee. PROI, Ex. F-10, p. 525-527; ROI, Ex. F-10, p. 229; Ex. F-3, p. 167; Ex. G-4, p. 314.

14.     At RMO1's direction, an Employee Relations Specialist received Complainant's Questionnaire and forwarded it and Complainant's reassignment request to NPS's Human Resources (HR) Staffing Office assigned to the Park. PROI, Ex. F-4, pp. 440-441. There is no information in the ROI regarding how or if NPS's HR Staffing Office responded to Complainant's May 2018 request for reassignment. However, Agency records indicate that NPS's HR Staffing Office may have been under the impression that in August of 2018, OWCP had notified Complainant that he needed to provide additional information to support his reassignment request. PROI, Ex. F-6, p. 450. Complainant provided additional information in support of his reassignment request in September of 2018 and in December of 2018. PROI, Ex. F-6, p. 450.

15.     On January 29, 2019, Complainant provided the Agency with a December 17, 2018 evaluation from an OWCP doctor which confirmed that Complainant continued to experience symptoms of PTSD and depression. ROI, Ex. F-10, pp. 236-241. The OWCP doctor noted that Complainant "is unable to drive to the park where the shooting took place," and that Complainant

---

[4] Although there is evidence that on November 8, 2017, and April 16, 2018, Complainant received medical evaluations recommending his transfer to work at a different park for four hours a day, there is no indication that he provided this documentation to the Agency before May of 2018. ROI, Ex. F-10, p. 235. There is also evidence of a conflicting January 25, 2018 medical evaluation advising Complainant not to return to work. ROI, Ex. F-10, p. 235.

Final Agency Decision
*Jeffry Thul v. Scott A. de la Vega, Secretary, U.S. Department of the Interior*
Agency Case No. DOI-NPS-20-0382

"attempted to go to the park, [but] he was unable to enter the park due to excessive anxiety and thoughts of past trauma, and had symptoms of increased scary thoughts." ROI, Ex. F-10, pp. 237, 240. Based on this, the OWCP doctor concluded that Complainant "is not able to perform the date of injury job." ROI, Ex. F-10, p. 240.

16.    However, the OWCP doctor also observed that Complainant was "very eager to go back to work for any National Park Service," and that Complainant "may benefit from working in a different park to heal him from the past trauma." ROI, Ex. F-10, p. 240. Complainant also informed the Agency that he could work up to four hours per day, or 20 hours per week, at another location. ROI, Ex. F-3, p. 167; Ex. F-10, p. 229.

17.    On February 12, 2019, NPS Human Resources (HR) initiated a reassignment job search as a reasonable accommodation for Complainant. ROI, Ex. F-9, pp. 225, 227; Ex. F-10, p. 230. Complainant allegedly informed the Agency that he would not accept a reassignment position outside of his local commuting area of Fort Oglethorpe, Georgia. ROI, Ex. F-9, p. 227; Ex. F-10, p. 230. As there are no NPS sites other than the Park within the local commuting area, NPS expanded the reassignment job search to other DOI bureaus. ROI, Ex. F-9, p. 227. Based on Complainant's resume and position description, the Agency determined that Complainant would be qualified for positions in the facilities, maintenance, administrative, and acquisition series. ROI, Ex. F-9, p. 227.

18.    On March 18, 2019, an NPS HR Assistant informed the Agency that HR had "received 2 negative responses from [DOI] bureaus and have not heard back from any others" regarding Complainant's reassignment job search. ROI, Ex. F-9, p. 226.

19.    There is no information in the ROI regarding the methodology that NPS HR and the other DOI bureaus used to conduct Complainant's reassignment job search, which DOI bureaus provided negative responses, and whether and how the remaining DOI bureaus responded to NPS HR's inquiry regarding Complainant's reassignment job search.

20.    On April 1, 2019, the NPS OWCP Coordinator concluded that NPS's reassignment job search had been unsuccessful. ROI, Ex. F-9, p. 225; Ex. F-3, p. 167-168. The NPS OWCP Coordinator stated that there were no available positions meeting Complainant's work restrictions at other locations within NPS and other DOI bureaus. ROI, Ex. F-9, p. 225. Additionally, there were no telework-eligible positions available in the Park. ROI, Ex. F-9, p. 225. There is no information in the ROI regarding whether Complainant's reassignment job search included telework-eligible positions at other Parks, other NPS locations, or other DOI bureaus.

21.    RMO2 stated that upon receiving the notification that the reassignment job search had been unsuccessful, Complainant did not vary the criteria for the reassignment job search. ROI, Ex. F-2, p. 148. There is no information in the ROI regarding whether the Agency had any available positions outside of Complainant's criteria that would have otherwise been suitable for reassignment; whether the Agency ever offered Complainant reassignment into such positions; or whether the Agency ever informed Complainant that his failure to vary the criteria for the reassignment job search could result in his removal.

5

020
Case 1:23-cv-00165-TRM-CHS    Document 1    Filed 08/04/23    Page 20 of 49    PageID #: 20

22.　　On June 5, 2019, RMO1 issued to Complainant a Proposed Non-disciplinary Removal for Inability to Perform Duties of Your Position ("Proposed Removal"). ROI, Ex. F-10, p. 229. In the Proposed Removal, RMO1 stated his belief that removing Complainant would "promote the efficiency of the service." ROI, Ex. F-10, pp. 229-234. In the Proposed Removal, RMO1 applied the *Douglas*[5] factors to Complainant's situation, despite repeatedly noting that the Proposed Removal was non-disciplinary in nature, and that no offense had been charged. ROI, Ex. F-10, pp. 229-234. In the Proposed Removal, RMO1 also stated that "[Complainant's] inability to return to the park due to [his] medical condition has affected my confidence in [his] inability to perform any of the essential duties of [his] position." ROI, Ex. F-10, p. 231.

23.　　RMO1 stated that by the time he proposed the removal on June 5, 2019, Complainant had been out of the Park for more than two years due to his medical conditions. ROI, Ex. F-3, p. 166; Ex. F-9, p. 219; Ex. G-4, pp. 305-314. Park management had been filling his position on a temporary basis in that time. ROI, Ex. F-3, p. 166. RMO1 stated that the position required "someone to be physically present in the Park for at least 40 hours a week, sometimes more to supervise employees in the Facilities and Maintenance Division, manage a division budget of over [$1 million], interact with other Park Division Chiefs, and occasionally [perform the duties of] Acting Superintendent." ROI, Ex. F-3, pp. 166-167; Ex. F-10, p. 230. RMO1 further stated that the position required varying contact with Park visitors and partners, the news media, and other members of the public. ROI, Ex. F-3, p. 167; Ex. F-10, p. 230. Based on this, RMO1 proposed Complainant's removal due to his inability to perform the essential functions of the position, so that the NPS could fill the role on a permanent basis. ROI, Ex. F-3, p. 167.

24.　　The Proposed Removal did not include any information regarding whether the Agency had considered alternative reasonable accommodations which would have allowed Complainant to perform the essential functions of his position. ROI, Ex. F-10, pp. 229-234. Nor did the Proposed Removal contain any analysis regarding whether any of the requested or considered accommodations would have posed an undue hardship to the Agency. ROI, Ex. F-10, pp. 229-234.

25.　　On June 21, 2019, Complainant notified RMO3, who was both his third-line supervisor and RMO1's first-line supervisor, that he felt that RMO1 and RMO2 were harassing him.[6] ROI, Ex. A, p. 54; Ex. F-1A, p. 123; Ex. F-2, pp. 158-159. The ROI does not contain a response from RMO3.

26.　　On July 8, 2019, Complainant emailed RMO2 to ask for an extension on his deadline to respond to the Proposed Removal. ROI, Ex. F-2, p. 157. On July 8, 2019, RMO2 extended Complainant's response deadline to July 23, 2019. ROI, Ex. F-2, p. 157. On July 23, 2019, Complainant emailed RMO2 his rebuttal to the Proposed Removal.[7] ROI, Ex. F-1, p. 121.

---

[5] In *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), the MSPB established a non-inclusive list of criteria that supervisors must consider in determining an appropriate penalty to impose for an act of employee misconduct.
[6] As this is a mixed case complaint concerning only Complainant's removal, this FAD will not address any other allegations of disparate treatment and/or harassment raised by Complainant.
[7] The ROI does not include Complainant's rebuttal to the Proposed Removal.

6

27.     On August 2, 2019, Complainant requested to return to duty. ROI, Ex. A, p. 58. On August 9, 2019, the NPS OWCP Coordinator determined that Complainant could not return to duty. ROI, Ex. A, p. 58. The ROI does not contain either Complainant's request to return to duty, or the NPS OWCP Coordinator's determination that Complainant could not return to duty.

28.     On September 13, 2019, RMO2 issued to Complainant a Non-disciplinary Removal Decision for Inability to Perform Duties of Your Position ("Removal Decision"). ROI, Ex. F-9, p. 218. The Removal Decision sustained RMO1's reasoning in the Proposed Removal. ROI, Ex. F-9, p. 218. The Removal Decision also noted that Complainant "did not respond nor reply to the substance of the proposed removal," and that Complainant did not "speak directly to the basis for the proposed removal, the factors that were considered, [Complainant's] health, or willingness to change [his] search criteria." ROI, Ex. F-9, p. 218.

29.     When asked if Complainant's disability limited his ability to carry out the essential functions of his position, RMO2 responded: "no, it didn't have a permanent impact on his ability to do work," citing Complainant's request for NPS to carry out a job search for a similar position. ROI, Ex. F-2, p. 147.

30.     Like the Proposed Removal, the final Removal Decision did not include any information regarding whether the Agency had considered alternative reasonable accommodations which would have allowed Complainant to perform the essential functions of his position, or whether any of the requested or considered accommodations would have posed an undue hardship to the Agency. ROI, Ex. F-9, pp. 218-224.

31.     On September 17, 2019, Complainant's removal became effective. ROI, Ex. F-8, p. 217; Ex. F-9, pp. 218-224.

## IV.     <u>Legal Analysis</u>

## <u>LEGAL AUTHORITY</u>

Disparate treatment based on disability (mental) and reprisal (Agency Case Nos. DOI-NPS-18-0033, DOI-NPS-18-0571) is prohibited by the Rehabilitation Act and Title VII of the Civil Rights Act of 1964. Federal sector EEO regulations are set out in 29 C.F.R. § 1614.

### *Disparate Treatment*

Where, as here, there is no direct evidence of discrimination, a claim of disparate treatment on the basis of reprisal is examined under the three-part analysis originally enunciated in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973). A complainant must first establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination, *i.e.*, that a prohibited reason was a factor in the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978).

The agency must then articulate a legitimate, nondiscriminatory reason for its action(s). *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). After the agency has offered the

7

reason for its action, the burden of production returns to the complainant to prove, by a preponderance of the evidence, that the agency's reason was pretextual, that is, it was not the true reason or the action was influenced by legally impermissible criteria. *Burdine*, 450 U.S. at 253; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). "Pretext means more than a mistake on the part of the employer; [pretext] 'means a lie, specifically a phony reason for some action.'" *Wolf v. Buss (America) Inc.*, 77 F. 3d 914, 919 (7th Cir. 1996). At all times, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. *Id.* It is not sufficient "to *disbelieve* the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 519 (emphasis in original).

### Qualified Individual with a Disability

The Rehabilitation Act prohibits employment discrimination against otherwise qualified federal employees on the basis of a disability. 29 U.S.C. § 794(a). The standards for determining a violation of the Rehabilitation Act, as amended, are the same as those for a violation of the Americans with Disabilities Act (ADA). 29 U.S.C. § 794(d); 29 C.F.R. § 1614.203(b); *see also* 42 U.S.C. § 12101, *et seq.*[8] The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007).

As a threshold matter, a complainant must establish that he is an individual with a disability. An individual with a disability is one who: (1) has a physical or mental impairment that substantially limits a major life activity; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 29 C.F.R. § 1630.2(g)(1).

Next, a complainant must show that he is "qualified" with regard to the requisite skill, experience, education, and other job-related requirements of the position at issue. 29 C.F.R. § 1630.2(m). In order to be considered "qualified," a complainant must also show that he can perform the essential functions of the position at issue. "Essential functions" are the fundamental job duties of a position, which are distinct from the methods employees may use to perform those functions. 29 C.F.R. § 1630.2(n)(2). For example, time and attendance are considered the methods by which an employee accomplishes the duties of a position, and thus are not considered essential functions of a position. *See Gilberto S. v. Dep't of Homeland Security*, EEOC Appeal No. 0320110053 (July 10, 2014).

### Failure to Accommodate

When an employee demonstrates that he is a qualified individual with a disability, an agency is required to provide reasonable accommodations necessary to perform the essential functions of that employee's position. 29 C.F.R. § 1630.2(o)(4). In addressing reasonable accommodations, the

---

[8] In September 2008, Congress amended the Americans with Disabilities Act (ADA) by enacting the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), effective as of January 1, 2009, "to restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, 122 Stat. 3553 (2008). The ADAAA was the legislative response to a series of Supreme Court cases that had narrowed the class of individuals protected by the ADA. Thus, among other things, the ADAAA expanded the class of individuals to be protected by providing a more expansive definition of "disability."

Case 1:23-cv-00165-TRM-CHS    Document 1    Filed 08/04/23    Page 23 of 49    PageID #: 23

parties should engage in an informal and flexible interactive process to identify the precise limitations of the individual and what accommodations could overcome those limitations. 29 C.F.R. § 1630.2(o)(3). Agencies retain the discretion to provide any accommodations which would be effective. *Goodman v. U.S. Postal Serv.*, EEOC Appeal No. 0120044371 (May 2, 2007).

If a disability and/or the need for an accommodation is not obvious, an employer may ask an individual who requests an accommodation for reasonable documentation about his disability and functional limitations. EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC No. 915.002 ("RA Enforcement Guidance"), Question 6 (2002). An agency may request additional information in order to evaluate a complainant's proposed accommodation in comparison to his or her current medical needs, in order to determine what accommodation would best serve the needs of the agency and the complainant. *Carlton T. v. Dep't of the Navy*, EEOC Appeal No. 0120151566 (Feb. 7, 2018).

Agencies are not required to provide reasonable accommodations which would create an undue hardship. 29 C.F.R. § 1630.2(o)(4). An undue hardship is a significant difficulty or expense incurred by the provision of an accommodation. 29 C.F.R. § 1630.2(p)(1). Factors to consider in assessing undue hardship include the overall size of the agency's program with respect to number of employees; the type and number of facilities; size of the budget; the type of agency operation, composition, and structure of the agency's workforce; and the nature and cost of the accommodation. 29 C.F.R. § 1630.2(p)(2).

## DISCUSSION

The Notice of Acceptance originally identified the accepted claim regarding Complainant's removal as a claim of disparate treatment based on disability and reprisal. ROI, Ex. C-1, p. 107. Because the Agency's stated reasoning for Complainant's termination relies, in part, on the undisputed fact that the Complainant's medical conditions prevent him from returning to the Park, this FAD will also analyze whether the Complainant's removal constituted a denial of a reasonable accommodation. *See e.g. Harvey G. v. Dep't of the Interior*, EEOC Appeal No. 0120132052 (Feb. 4, 2016) (restating agency's formulation of claims, in part, as "whether Complainant established that he was denied reasonable accommodation for his disability when he was not allowed to telework, and was subsequently terminated from employment with the Agency"). This FAD will then analyze the issue of whether Complainant was subjected to disparate treatment on the basis of reprisal with regard to his removal.

### *Failure to Accommodate*

#### *Factual Deficiencies in Investigative Record*

Although the ROI contains sufficient information to adjudicate the ultimate issue in this case, the ROI also contains relevant factual deficiencies regarding the Agency's response to Complainant's initial reassignment request, as well as its reassignment job search. Agencies have a legal obligation under 29 C.F.R. § 1614.108(b) to conduct an adequate investigation into formal EEO complaints. An adequate investigation is one which is developed impartially, and which contains

9

an appropriate factual record that would allow a reasonable fact finder to draw conclusions as to whether discrimination occurred. EEO MD-110, 6(I); 29 C.F.R. § 1614.108(b). If the Agency fails to conduct an adequate investigation, the decisionmaker may draw an adverse factual inference against the Agency or consider the pertinent matters to be established in the Complainant's favor. *See* 29 C.F.R. § 1614.108(c)(3). Factual deficiencies are noted in the Statement of Facts, *supra*, as well as in the following analysis. To the extent that the factual deficiencies arise from inadequate documentation by the Agency, all inferences will be drawn in Complainant's favor. *See Macready v. Dep't of Justice*, EEOC Appeal No. 01990453 (Apr. 4, 2002) ("when a party fails to produce relevant evidence within its control, the failure to produce such evidence raises an inference that the evidence, if produced, would prove unfavorable to that party").

### *Individual with a Disability*

It is undisputed that Complainant is an individual with a disability. Complainant's diagnoses of PTSD and depression are among those listed in the EEOC's regulations as impairments which "virtually always be found to impose a substantial limitation on a major life activity." 29 C.F.R. § 1630.2(j)(3)(iii).

### *Qualified for the Position*

Despite medical limitations which prevented him from performing certain essential functions of his original Supervisory Facility Operations Specialist position, Complainant was "qualified" within the meaning of the Rehabilitation Act.

After his PTSD-related breakdown at the Park in July of 2017, Complainant repeatedly submitted medical documentation stating that he could no longer perform the essential functions of his original Supervisory Facility Operations Specialist position. ROI, Ex. F-10, p. 229; Ex. F-3, p. 167; Ex. G-4, pp. 305-314. Complainant's PTSD made him "unable to drive to the park where the shooting took place." ROI, Ex. F-10, pp. 237, 240. Although physical presence at a worksite is not itself an essential function, it can be a necessary condition to perform certain essential functions. *Gilberto S. v. Dep't of Homeland Security*, EEOC Appeal No. 0320110053 (July 10, 2014) ("Performing certain job functions sometimes requires a person's presence at the worksite"). Some essential functions of Complainant's position required his physical presence at the Park, including: supervising employees in the Facilities and Maintenance Division; performing the duties of Acting Superintendent; monitoring and evaluating maintenance programs; performing and maintaining asset inventories and condition assessments; developing and implementing projects, including facility modifications; and managing construction processes. ROI, Ex. F-3, pp. 166-167; Ex. F-7, p. 206.

However, Complainant was still "qualified" to perform other positions which he could have been reassigned into as a reasonable accommodation. The analysis of whether a complainant was "qualified" also extends to whether the complainant was qualified for positions that he *could have* held as a result of reassignment. *Mirta Z. v. Dep't of Homeland Sec.*, EEOC Appeal No. 0120170095 (Apr. 6, 2018) ("in determining whether an employee is "qualified," an agency must look beyond the position which the employee presently encumbers"). Complainant provided medical documentation that he could work up to four hours per day, or 20 hours per week, at

10

another location, and included documentation of an OWCP doctor's observation that he might even "benefit from working in a different park to heal him from the past trauma." ROI, Ex. F-3, p. 167; Ex. F-10, pp. 229, 240. Upon reviewing his resume and position description, the Agency determined that Complainant would be qualified for positions in the facilities, maintenance, administrative, and acquisition series. ROI, Ex. F-9, p. 227. RMO2, the deciding official on Complainant's Removal Decision, also stated his opinion that Complainant's medical conditions "didn't have a permanent impact on his ability to do work." ROI, Ex. F-2, p. 147.

Therefore, Complainant was a "qualified" individual with a disability in accordance with the Rehabilitation Act. Agencies have an affirmative obligation to provide qualified employees with disabilities, such as Complainant, with reasonable accommodations necessary to perform the essential functions of their position. 29 C.F.R. § 1630.2(o)(4).

<u>Indefinite Leave Not a Reasonable Accommodation</u>

The Agency was not obligated to indefinitely extend Complainant's leave as a reasonable accommodation. "Although leave is permitted as an accommodation, [leave without pay] for an indefinite period of time with no indication that one will or could return is not an accommodation contemplated under the Rehabilitation Act." *Valente v. U.S. Postal Serv.*, EEOC Appeal No. 01A34243 (Nov. 24, 2004). Here, Complainant submitted multiple FMLA requests for short-term disability leave from July 25, 2017 through his termination on September 17, 2019. ROI, Ex. G-4, pp. 306-314. While some of these requests provided theoretical end dates for Complainant's leave, the record reveals that Complainant never returned to work at any point in the two years prior to his termination. ROI, Ex. G-4, pp. 306-314; Ex. F-3, p. 166; Ex. F-9, p. 219. Despite Complainant's contentions that he only needed leave temporarily, there was no indication that Complainant could or would return to his prior position. Complainant's continued inability to provide and adhere to an estimated return date, his repeated requests for additional leave, and his ultimate request for reassignment, when taken as a whole, constituted a request for indefinite leave. The Agency thus had no obligation to allow Complainant to retain his position of record on indefinite leave as a reasonable accommodation.

<u>Reassignment as a Reasonable Accommodation</u>

When no reasonable accommodations could allow an employee to perform the essential functions of their position, the agency's affirmative obligation extends to reassigning employees to other open positions for which they are qualified. 29 C.F.R. § 1630.2(o)(2)(ii). Although reassignment is typically considered to be the reasonable accommodation of last resort, where, as here, "both the agency and the employee voluntarily agree that reassignment is preferable to remaining in the current position with some form of accommodation . . . the agency may transfer the employee." *Reina D. v. Soc. Sec. Admin.*, EEOC Appeal No. 0120150410 (Nov. 29, 2017). Both the Agency and Complainant agreed that Complainant's reassignment would be preferable to attempting to accommodate Complainant in his original position. ROI, Ex. F-9, p. 225; Ex. F-10, p. 229; Ex. F-3, p. 167; Ex. G-4, p. 314.

11

*Delay of Reassignment Job Search*

However, the Agency unnecessarily delayed its efforts to reasonably accommodate Complainant via reassignment. When an individual with a disability requests a reasonable accommodation, the agency should respond and/or begin the interactive process as quickly as possible, because unnecessary delays in responding to requests or providing accommodations can result in a violation of the Rehabilitation Act. *See e.g. Ruben T. v. Dep't of Justice*, EEOC Appeal No. 0120171405 (Mar. 22, 2019). In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer each contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was simple or complex to provide. *Id.*

Regarding the first factor, the record contains no explanation for why the Agency waited approximately nine months after Complainant's May 2018 request for reassignment to initiate its job search. ROI, Ex. F-10, p. 229; Ex. F-3, p. 167. Although NPS's HR Staffing Office may have been under the impression that in August of 2018, OWCP had notified Complainant that he needed to provide additional information to support his reassignment request, the OWCP process is conducted through the Department of Labor, and is distinct from the reassignment job search process. PROI, Ex. F-6, p. 450. This would not explain the delay.

Regarding the second factor, it is undisputed that the Agency waited approximately nine months after Complainant's request for reassignment to initiate its job search. ROI, Ex. F-10, p. 229; Ex. F-3, p. 167. The EEOC has found even shorter agency delays to have violated the Rehabilitation Act. *See Chara S. v. Dep't of Veterans Affairs*, EEOC Appeal No. 2019001100 (July 16, 2020) (finding that the agency violated the Rehabilitation Act "when it delayed approval of Complainant's part-time telework request by approximately four months"). Complainant provided medical documentation in support of his request for reassignment in May of 2018, and the Agency did not initiate the reassignment job search until February 12, 2019. ROI, Ex. F-10, pp. 229, 230; Ex. F-9, pp. 219, 225, 227.

Regarding the third factor, there is no evidence that the delay occurred on Complainant's part. Both RMO1's Proposed Removal and RMO2's Removal Decision noted that in May of 2018, Complainant submitted medical documentation stating that he could no longer work at the Park and requesting reassignment to another park. ROI, Ex. F-10, p. 229; Ex. F-9, p. 219. The timeline of events set forth by both the Proposed Removal and the Removal Decision does not suggest that the Agency found this documentation inadequate to support Complainant's request, or that the Agency needed any additional documentation from Complainant in order to begin the interactive process. ROI, Ex. F-10, p. 229; Ex. F-9, p. 219. Nor is there any such contention in either RMO1's or RMO2's affidavits. ROI, Ex. F-2, pp. 143-152; Ex. F-3, pp. 161-170. Additionally, even assuming that Complainant's May 2018 reassignment request had not contained sufficient information, Complainant provided the requested information in support of his reassignment request in September of 2018 and in December of 2018, well before the Agency finally initiated the reassignment job search on February 12, 2019. PROI, Ex. F-6, p. 450.

12

Regarding the fourth factor, there is no evidence that the Agency took any actions at all on Complainant's reassignment request – much less engaged in the interactive process – until February 12, 2019. ROI, Ex. F-10, p. 229; Ex. F-9, p. 219.

Regarding the fifth factor, there is substantial evidence that the requested reassignment was complex to provide. Complainant allegedly informed the Agency that he would not accept a reassignment position outside of his local commuting area of Fort Oglethorpe, Georgia. ROI, Ex. F-9, p. 227; Ex. F-10, p. 230. As there are no NPS sites other than the Park within the local commuting area, NPS had to expand the reassignment job search to other DOI bureaus, which required each DOI bureau to conduct a separate search. ROI, Ex. F-9, p. 227. However, the complexity of providing reassignment does not explain the Agency's delay in *starting* the reassignment job search.

Taken as a whole, these five factors establish that the Agency unduly delayed the reasonable accommodation process when it waited nine months to even begin the reassignment job search for Complainant.

*Delay of Reassignment Job Search Resulted in Failure to Reasonably Accommodate*

Although Complainant has established that the Agency delayed in providing him with reasonable accommodations, "the allegation that the Agency failed to properly engage in the interactive process, does not, by itself, demand a finding that Complainant was denied a reasonable accommodation. Rather, to establish a denial of a reasonable accommodation, Complainant must establish that the failure to engage in the interactive process *resulted in* the Agency's failure to provide a reasonable accommodation." *Mandy B. v. Dep't of Veterans Aff.*, EEOC Appeal No. 0120170313 (Mar. 26, 2019) (emphasis added).

In reassignment cases, Complainant typically has the evidentiary burden of establishing by a preponderance of the evidence that "there were vacancies during the relevant time period into which [] he could have been reassigned. Complainant can establish this by producing evidence of particular vacancies. However, this is not the only way of meeting Complainant's evidentiary burden. In the alternative, Complainant could show that: (1) [] he was qualified to perform a job or jobs which existed at the agency, and (2) there were trends or patterns of turnover in the relevant jobs so as to make a vacancy likely during the time period." *Mirta Z. v. Dep't of Homeland Sec.*, EEOC Appeal No. 0120170095 (Apr. 6, 2018). For reassignment purposes, "'vacant' means that the position is available when the employee asks for reasonable accommodation, or that the employer knows that it will become available within a reasonable amount of time." RA Enforcement Guidance.

Complainant did not provide any evidence of vacancies into which he could have been reassigned in between his May 2018 request for reassignment and the Agency's February 13, 2019 reassignment job search. But "[w]hile the burden of establishing the existence of such a vacant funded position lies with Complainant, he must be given the opportunity to present the evidence necessary to establish that a position exists." *Ruben P. v. Soc. Sec. Admin.*, EEOC Appeal No. 0720130013 (Aug. 14, 2014). In *Ruben P.*, an agency argued that it should not have been liable for failing to reassign a complainant as a reasonable accommodation because the complainant had

not shown that there was a vacant funded position to which he could have been reassigned. *Id.* The EEOC declined to address this argument on procedural grounds, but also noted that "the Agency's failure to engage Complainant in the interactive process, once he requested reassignment, resulted in his being denied a reasonable accommodation. If there was an interactive process, Complainant would have had the opportunity to present evidence regarding vacant, funded positions to which he could have been reassigned." *Id.* Here, as in *Ruben P.*, the Agency failed to engage in the interactive process with Complainant. The Agency waited nine months after Complainant's May 2018 request for reassignment to initiate its job search. ROI, Ex. F-10, pp. 229, 230; Ex. F-9, pp. 219, 225, 227. There is no evidence that the Agency ever informed Complainant that he could or should seek vacant, funded positions for his own reassignment from May 2018 until the Agency began its job search on February 12, 2019. This resulted in Complainant not being given any opportunity to present the evidence necessary to establish that such a position existed.

Additionally, the discovery that there were no vacant funded positions within Complainant's requested criteria only arose after the Agency had already delayed initiating the reassignment job search by nine months. On April 1, 2019, the Agency concluded that its February 12, 2019 reassignment job search for Complainant had been unsuccessful, and that there were no vacant, funded positions within the requested criteria into which Complainant could be reassigned. ROI, Ex. F-9, p. 225. Nine months is a significant period of time, during which a suitable position could have become vacant and subsequently been filled. As Complainant was never afforded the opportunity to establish whether such a position existed in part because of the Agency's failure to conduct an adequate investigation,[9] it is appropriate to draw the inference in Complainant's favor that such a position likely became vacant at some point during the Agency's nine-month delay. *See* 29 C.F.R. § 1614.108(c)(3); *Macready v. Dep't of Justice*, EEOC Appeal No. 01990453 (Apr. 4, 2002) ("when a party fails to produce relevant evidence within its control, the failure to produce such evidence raises an inference that the evidence, if produced, would prove unfavorable to that party"); *Mirta Z. v. Dep't of Homeland Sec.*, EEOC Appeal No. 0120170095 (Apr. 6, 2018) (noting that complainant can establish denial of reassignment as a reasonable accommodation without establishing a *specific* vacancy, by establishing "there were trends or patterns of turnover in the relevant jobs so as to make a vacancy likely during the time period").

Moreover, any lack of evidence regarding whether Complainant's requested criteria prevented a successful job search arises directly from the Agency's continued failure to engage in the interactive process. "[T]he Agency is in the best position to know which jobs are vacant or will become vacant within a reasonable period of time and it is obligated to inform an employee about vacant positions for which a complainant may be eligible as a reassignment." *Felton A. v. Dep't of Homeland Sec.*, EEOC Appeal No. 2019005820 (May 14, 2020). Here, the Agency did not provide evidence of any available positions outside of Complainant's criteria that would have otherwise been suitable for reassignment. If such positions existed, the Agency could have engaged in the interactive process with Complainant to discuss whether Complainant was willing and medically able to modify his requested criteria. Nor is there evidence that the Agency ever informed

---

[9] The investigator did not ask Complainant to provide any evidence of vacant, funded positions which he could have been reassigned into. ROI, Ex. F-1, pp. 113-127. The ROI does not contain any evidence regarding whether the Agency searched for vacant, funded positions in the period between Complainant's May 2018 request for reassignment and its February 13, 2018 reassignment job search.

Complainant that his failure to vary the criteria for the reassignment job search could result in his removal.

Therefore, the Agency's nine-month delay in initiating the reassignment job search for Complainant likely resulted in its ultimate failure to reasonably accommodate Complainant.

## *Complainant's Requested Criteria for Reassignment Job Search Not Undue Hardship*

Once a Complainant has established a denial of reasonable accommodation, an Agency may raise an affirmative defense by providing "case-specific evidence proving that providing reasonable accommodation would cause an undue hardship." *See e.g. Julius C. v. Dep't of the Air Force*, EEOC Appeal No. 0120151295 (June 16, 2017). The Agency has not met that burden here.

There is no evidence that the Agency's delay in initiating Complainant's reassignment job search was due to any undue hardship. RMO1 and RMO2 did not raise any undue hardship issues in their reasoning for terminating Complainant. ROI, Ex. F-3, pp. 161-178; Ex. F-2, pp. 143-152. Nor did the Agency assert at any point in either the Proposed Removal or the Removal Decision that Complainant's reassignment would cause the Agency an undue hardship. ROI, Ex. F-9, pp. 218-224; Ex. F-10, pp. 229-234. At most, the Agency explained that its job search did not find any vacant funded positions within Complainant's requested criteria. RMO1 and RMO2 stated that Complainant had requested reassignment into a similar position at another park within commuting distance of his home in Chattanooga, Tennessee, and cited the lack of positions within Complainant's requested criteria as a reason for his removal.[10] ROI, Ex. F-9, pp. 218-224; Ex. F-10, pp. 230, 232; Ex. F-2, pp. 148-149; Ex. F-3, p. 167.

Since the Agency failed to engage in the interactive process with Complainant to discuss whether Complainant was willing and medically able to modify his requested job search criteria, it does not have the necessary information to establish that reassigning Complainant would have caused an undue hardship. Therefore, the Agency is liable for its failure to reasonably accommodate Complainant.

## *Insufficient Evidence Regarding Whether Agency Acted in Good Faith*

An agency may be found to have violated the Rehabilitation Act by failing in its affirmative duty to accommodate a disability even if the agency made a good faith effort to provide an accommodation. *See, e.g., Schauer v. Soc. Sec. Admin.*, EEOC Appeal No. 01970854 (July 13, 2001). However, "[a]n agency is not liable for compensatory damages under the Rehabilitation Act where it has consulted with complainant and engaged in good faith efforts to provide a reasonable accommodation but has fallen short of what is legally required." *Don F. v. Soc. Sec. Admin.*, EEOC Appeal No. 2019002029 (Sep. 22, 2020). "A good faith effort can be demonstrated by proof that the agency, in consultation with the disabled individual, attempted to identify and

---

[10] Although the Rehabilitation Act does not mandate the creation of a new position for qualified individuals with disabilities in need of reassignment, ODICR notes that Agencies always have the discretion to go above and beyond the bare requirements of the law in order to provide a model workplace for individuals with disabilities. Creating a new position for Complainant here would thus have been an appropriate solution as a reasonable accommodation, especially as Complainant was only seeking to work part-time for 20 hours a week.

make a reasonable accommodation." *Guilbeaux v. U.S. Postal Serv.*, EEOC Appeal No. 0720050094 (Aug. 6, 2008).

Here, the Agency failed in its duty to reasonably accommodate Complainant's disability when it delayed initiating its job search for nine months, when it failed to engage in the interactive process with Complainant after its job search did not yield results within Complainant's requested criteria, and when it removed Complainant from his position due to his medical inability to perform. However, there is insufficient evidence in the ROI to determine if these failures occurred despite good faith efforts on the Agency's part. The record indicates that the Agency did make some efforts to reasonably accommodate Complainant. For example, the Agency repeatedly extended the Complainant's leave as requested for nearly two years. ROI, Ex. F-3, p. 166; Ex. F-9, p. 219; Ex. G-4, pp. 305-314. The Agency also granted Complainant extended time to respond to the Proposed Removal. ROI, Ex. F-2, p. 157. Whether these efforts would be sufficient to rise to the level of "good faith" needed to avoid liability for compensatory damages is thus a question that must be answered in a supplemental investigation.[11]

### Denial of Reasonable Accommodation Conclusion

The Agency failed in its duty to reasonably accommodate Complainant. Complainant has established that he is a qualified individual with a disability under the Rehabilitation Act. As he could no longer perform the essential functions of his position of record, and indefinite FMLA leave was not a reasonable accommodation, Complainant was entitled to the reasonable accommodation of reassignment. Although Complainant requested reassignment in May of 2018, the Agency delayed initiating the reassignment job search until February 12, 2019, which resulted in a denial of reasonable accommodations. The Agency's failure to continue the interactive process following the unsuccessful job search based on Complainant's requested criteria also constituted a denial of reasonable accommodations, which ultimately resulted in Complainant's removal. Additionally, the Agency has not met its burden of establishing an affirmative defense of undue hardship with regard to its delay and denial of reasonable accommodations. Therefore, the Agency failed in its duty to reasonably accommodate the Complainant.

### Disparate Treatment on the Basis of Reprisal

### Prima Facie Case

Where, as here, there is no direct evidence of discrimination, a complainant may proceed using circumstantial evidence of discrimination by satisfying the three-part evidentiary scheme articulated by the Supreme Court in *McDonnell Douglas*. To establish a *prima facie* case of retaliation, a complainant must show that: (1) he engaged in a protected activity; (2) management was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there is a causal connection between his protected activity and the materially adverse action. *Whitmire v. Dep't of the Air Force*, EEOC Appeal No. 01A00340 (Sept. 25, 2000).

---

[11] *See* Statement of Relief, *infra*.

Complainant has established a *prima facie* case of discrimination on reprisal. Complainant engaged in protected activity when he filed formal EEO complaints including Agency Case Nos. DOI-NPS-18-0033 and DOI-NPS-18-0571, as well as this complaint. ROI, Ex. F-1, p. 118. Both RMO1 and RMO2 were aware of Complainant's protected activity before the adverse action at issue. ROI, Ex. F-3, p. 166; Ex. F-2, p. 147. Complainant suffered a materially adverse action when RMO1 proposed Complainant's removal on June 5, 2019, which RMO2 sustained on September 13, 2019, resulting in Complainant's September 17, 2019 removal. ROI, Ex. F-8, p. 217; Ex. F-9, pp. 218-224.

There is sufficient evidence to establish an inference of a causal connection between Complainant's protected activity and his removal because RMO1 and RMO2 were named as responsible management officials in Complainant's previous EEO complaints, and because of the temporal proximity between RMO1 and RMO2's spring 2019 interviews regarding a different EEO complaint and the June 5, 2019 Proposed Removal. *See Breeden*, 532 U.S. at 273-74 (holding that, in retaliation cases relying solely on temporal proximity to establish causation, "the temporal proximity must be 'very close'"); *Moss v. Dep't of Def.*, EEOC Appeal No. 01913531 (Jan. 27, 1992) (stating that the complainant was able to establish a *prima facie* case of retaliation despite a two-year gap between the complainant's prior EEO activity and her non-selection because the selecting official was continuously closely involved with the complainant's prior protected activity).

Complainant has thus established his *prima facie* case of discrimination on reprisal.

<u>*Management's Articulation*</u>

Because Complainant has established his *prima facie* case of discrimination based on reprisal, the Agency must now articulate legitimate, non-discriminatory, and non-retaliatory reasoning for its actions in this case. *Burdine*, 450 U.S. 248. In order to meet its burden, Management need only show that it based its decision on a legitimate consideration and not on an illegitimate one. *Furnco*, 438 U.S. 567, 577. The defendant need not "prove absence of discriminatory motive." *Bd. Of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 (1978). Rather, the defendant need only "articulate some legitimate, nondiscriminatory reason for its action." *Id.* In *Burdine*, the Supreme Court held that the burden on the employer is to "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." 450 U.S. at 257. The evidence presented by management need not establish management's actual motivation. If management meets this burden of production, the presumption of discrimination raised by the *prima facie* case is rebutted and drops from the case altogether. *Id.*

Management's articulated reason for removing Complainant was due to his medical inability to perform the duties of his position, and due to the lack of vacant funded positions within Complainant's requested criteria for reassignment. ROI, Ex. F-9, pp. 219-224. The foregoing reasons are sufficiently clear and specific to afford Complainant a full and fair opportunity to demonstrate pretext. *See e.g. Lino L. v. Dep't of the Navy*, EEOC Appeal No. 0320170013 (Feb. 15, 2017) ("the Agency provided legitimate, non-discriminatory reasons for [Complainant's]

17

removal – namely that he was medically unable to perform the duties of his position"). Management has thus met its burden of production.

*Pretext*

Because the Agency has articulated a legitimate, nondiscriminatory reason for its conduct, in order to prevail, Complainant must demonstrate, by a preponderance of the evidence, that the stated reasons are a pretext for discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Burdine, supra; McDonnell Douglas, supra*. A complainant may show pretext by evidence that a discriminatory reason more likely than not motivated management; that management's articulated reasons are unworthy of belief; that management has a policy or practice disfavoring Complainant's protected class; that management has discriminated against Complainant in the past; or that management has traditionally reacted improperly to legitimate civil rights activities. *See McDonnell Douglas, supra*.

Here, Complainant submitted documentation stating that he was no longer medically able to return to the Park due to his PTSD and depression from July 24, 2017, through his September 17, 2019 removal. Ex. F-3, p. 166; Ex. F-9, p. 219; Ex. G-4, pp. 305-314. It is undisputed that the Agency's job search did not yield any vacant funded positions within Complainant's requested criteria. ROI, Ex. F-9, p. 225. Although the Agency's deficiencies in its efforts to reassign Complainant may have fallen short of its Rehabilitation Act obligations, there is no evidence that such deficiencies resulted from retaliatory intent on the part of any management officials. In fact, RMO1 promptly forwarded Complainant's reassignment request to the appropriate NPS HR personnel in May of 2018. PROI, Ex. F-2, p. 425; Ex. F-4, pp. 440-441.

RMO1 consistently stated his belief that Complainant's position required "someone to be physically present in the Park," and that removing Complainant would "promote the efficiency of the service." ROI, Ex. F-3, pp. 166-167; Ex. F-10, pp. 229-234. RMO2 agreed with RMO1's reasoning, and noted that Complainant "did not respond nor reply to the substance of the proposed removal," and that Complainant did not "speak directly to the basis for the proposed removal, the factors that were considered, [Complainant's] health, or willingness to change [his] search criteria." ROI, Ex. F-9, p. 218.

Complainant's disagreement with management's assessment of his medical ability to perform is not enough to disprove the Agency's reasoning, or to establish pretext. *Alex L. v. Dep't of Transp.*, EEOC Appeal No. 0120140970 (Jun. 1, 2016) ("Pretext analysis is not concerned with whether the Agency's action was unfair or erroneous but whether it was motivated by discriminatory animus"). And agencies may even make unwise or mistaken business decisions, so long as those decisions are not a pretext for unlawful discrimination. *See e.g. Robinson v. Dep't of Veterans Aff.*, EEOC Appeal No. 01A22253 (Sep. 22, 2003) (finding no pretext even where complainants had conclusively shown that management's articulated reasoning had relied on incorrect cost-benefit analyses).

In sum, Complainant did not establish that Management's articulated reasons were false or that Management's actions were based on Complainant's EEO activity. Complainant retains the burden of proof to establish discrimination by a preponderance of the evidence. It is not sufficient

"to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, *supra* at 519 (emphasis in original). Complainant's subjective belief, however genuine, does not constitute evidence of pretext or provide a basis for remedial relief. *See Anonymous v. Office of Personnel Management*, EEOC Appeal No. 0120122901 (Jan. 23, 2014) (no pretext when "Complainant simply offers a different interpretation of the supervisor's actions"). ODICR thus finds that Complainant failed to meet his burden to demonstrate that management's articulated reasons were pretext.

As he has not met his burden of demonstrating that management's articulated reasons were pretextual, Complainant cannot establish that he was subjected to disparate treatment in reprisal for his prior EEO activity with regard to his termination.

## V.    Statement of Conclusion

Based on a review of the record and the above analysis, ODICR finds that the preponderance of the evidence supports Complainant's claim of unlawful discrimination. Accordingly, ODICR finds that Complainant has proven that he was subjected to disparate treatment based on disability (mental) as alleged, in violation of the Rehabilitation Act.

## VI.    Statement of Relief

*Corrective Actions*
1. The Agency shall post copies of the attached notice at the Chickamauga and Chattanooga Military Park ("Park") in Chattanooga, Tennessee. Copies of the notice, after being signed by the Agency's duly authorized representative, shall be posted by the Agency within thirty (30) calendar days of the date this decision becomes final, and shall remain posted for sixty (60) consecutive days, in conspicuous places, including all places where notices to employees are customarily posted. The Agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted to ODICR within ten (10) calendar days of the expiration of the posting period.
2. Within thirty (30) calendar days, the Agency shall reinstate Complainant to his original position at a location within his local commuting area of Chattanooga, Tennessee, other than the Chickamauga and Chattanooga Military Park ("Park").
3. The Agency shall initiate another reassignment job search for Complainant within thirty (30) calendar days of receiving this decision, in accordance with the below specifications.
   a. The Agency must notify Complainant that:
      i. The Agency is conducting this search;
      ii. Complainant has the opportunity to submit updated information regarding any relevant medical limitations or needed reasonable accommodations;
      iii. Complainant has the opportunity to assist the agency's efforts by suggesting open positions for which he believes he is qualified, including positions posted publicly on USAJOBS.
   b. The search must include, but is not limited to:
      i. All DOI positions at a GS-12 (or equivalent) within the following occupational series:

19

- 1601: Facility Management Specialist
- 1640: Facility Operations Specialist
- 0343: Management Analyst (administrative, budget, and/or procurement)
- 0341: Administrative Officer (administrative, budget, and/or procurement)
- 4749: Maintenance Supervisor
- 1173: Housing Manager
- 1176: Building Manager
- 1101: Business Manager/Acquisition Program Manager (facilities)

    ii. All DOI positions outside of the above-listed occupational series for which Complainant could be considered "qualified," including positions which Complainant could perform with reasonable accommodations.

    iii. Any DOI positions which are not officially designated as remote, but which could be performed remotely as a reasonable accommodation.

    iv. Any DOI positions which are not currently vacant, but which will become vacant within one hundred and twenty (120) calendar days of receiving this decision.

  c. The Agency must document:

    i. Its methodology of searching for suitable positions;

    ii. The outcomes of its search, including null outcomes, for each of its bureaus;

    iii. Each position it offers to Complainant as a result of the search, and Complainant's response to each offered position.

  d. If a search based on Complainant's requested criteria does not yield any results, the Agency must expand its search to positions outside of Complainant's requested criteria.

  e. If the Agency finds vacant funded positions for which Complainant would be qualified, with or without reasonable accommodations, the Agency must offer any such positions to Complainant in writing, regardless of whether those positions fit within Complainant's requested criteria.

  f. If this search does not yield any DOI positions for which Complainant would be qualified within the specified deadline, the Agency may conclude this search, and notify Complainant of its findings.

4. The Agency shall provide a minimum of eight (8) hour(s) of EEO training to RMO1 and RMO2 within one hundred and twenty (120) calendar days of receiving this order. The training should include detailed information regarding the Rehabilitation Act, reasonable accommodations, the interactive process, and record-keeping obligations and best practices related to the reasonable accommodation process.

5. The Agency shall provide a minimum of four (4) hour(s) of EEO training to all NPS Human Resources personnel involved in reassignment job searches within one hundred and twenty (120) calendar days of receiving this order. The training should include detailed information regarding the Rehabilitation Act, the scope of Agencies' obligations to provide reassignment as a reasonable accommodation, the interactive process, and record-keeping obligations and best practices related to the reasonable accommodation process.

6. The Agency shall consider taking disciplinary action against the individual or individuals, still working for the Agency, who were responsible for denying complainant a reasonable accommodation within sixty (60) calendar days of receiving this decision. I.e., RMO1 and RMO2. If the Agency decides to take disciplinary action, it shall identify to ODICR the action taken. If the Agency decides not to take disciplinary action, it shall set forth to ODICR the reason(s) for its decision not to impose discipline.

7. The Agency shall conduct a supplemental investigation into damages within sixty (60) calendar days of receiving this decision. Upon completion of the supplemental investigation, the Agency shall issue to Complainant the Supplemental Report of Investigation (SROI).

8. The Agency is directed to submit a Compliance Report to ODICR every thirty (30) calendar days of receiving this decision until full compliance has been attained. The Compliance Report shall include supporting documentation of the Agency's implementation of all above-listed corrective actions.

9. The Complainant may submit a full accounting of his claimed compensatory damages to ODICR. This full accounting should include documentary evidence supporting his accounting, as well as documentary evidence of any attempts to mitigate his damages. The Complainant must submit this accounting to ODICR by email within sixty (60) calendar days of receiving this decision. If more time is needed, the Complainant may request an extension from ODICR at doicivilrights@ios.doi.gov.

10. ODICR will issue its decision on damages within sixty (60) calendar days of receiving the latest of the above-listed submissions.

### *Supplemental Investigation into Good Faith and Compensatory Damages*

The Agency's supplemental investigation into the issue of whether the Agency's failure to reasonably accommodate Complainant occurred despite its good faith efforts and whether Complainant is entitled to compensatory damages must provide sufficient evidence to allow a factfinder to answer the following questions:

#### *Good Faith (All questions are for the Agency unless otherwise indicated)*
1. Did the Agency receive Complainant's May 2018 request for reassignment? If so, when? The Agency must document the exact date and method by which it received Complainant's May 2018 request for reassignment and provide the names of all Agency personnel who received Complainant's request.
2. Ask Complainant AND the Agency: What specific documentation did Complainant submit to the Agency in May of 2018 as part of his request for reassignment? All relevant documentation submitted by Complainant must be included in the Supplemental ROI, with submission dates indicated.
3. Did Complainant's May 2018 request for reassignment contain sufficient information to substantiate the medical need for reassignment? If not:
   a. What additional information was needed?
   b. Why was this information needed?
   c. Did the Agency have other medical documentation from Complainant from previous reasonable accommodation requests which would have substantiated the medical need for reassignment? If so, when did it receive this information? All

21

relevant documentation submitted by Complainant must be included in the Supplemental ROI, with submission dates indicated.

    d. Did the Agency notify Complainant that it needed more information to begin the reassignment process? If so, who notified the Complainant, and when? All of the Agency's notifications to Complainant must be included in the Supplemental ROI, with notification dates indicated.

    e. Did the Complainant ultimately provide sufficient information to substantiate the medical need for reassignment? If so, when? All relevant documentation submitted by Complainant must be included in the Supplemental ROI, with submission dates indicated.

4. Ask Complainant AND the Agency: Did the Agency ever inform Complainant that he had the option to suggest existing vacant funded positions for his own reassignment? If so, when? Provide documentation. If not, why?

5. Ask Complainant AND the Agency: Did the Agency respond to Complainant's May 2018 request for reassignment as a reasonable accommodation?

    a. If so:
        i. When did the Agency respond?
        ii. What was the Agency's response?
        iii. Which Agency personnel responded?
        iv. All of the Agency's responses to Complainant's May 2018 request for reassignment must be included in the Supplemental ROI, with dates indicated.

    b. If not:
        i. Why not?
        ii. Which Agency personnel were responsible for handling Complainant's May 2018 request for reassignment as a reasonable accommodation?

6. Were there other factors contributing to the Agency's May 2018 to February 12, 2019 delay in initiating the Complainant's reassignment job search? If so, what were these factors? Any relevant documentation of these factors, including contemporaneous emails and notes regarding these factors, must be included in the Supplemental ROI, with dates indicated.

7. Ask Complainant AND the Agency: Did the Agency consider interim accommodations other than reassignment for Complainant from May 2018 to February 12, 2019? If so:

    a. What accommodations were considered for Complainant? For each considered accommodation:

    b. When was this accommodation considered?

    c. Was this accommodation offered to Complainant? If not, why? If so, provide documentation.

    d. Did Complainant respond to the offered accommodation? If so, what was the response? Provide documentation.

    e. Was this accommodation implemented? If not, why? If so, when? Provide documentation.

8. Ask Complainant AND the Agency: Did the Complainant request any interim accommodations other than reassignment from May 2018 to February 12, 2019?

    a. What other accommodations did Complainant request? For each requested accommodation:

    b. When did Complainant request this accommodation? Provide documentation.

22

    c. How would this accommodation help the Complainant perform the essential functions of his position?

    d. What medical documentation, if any, did Complainant submit in support of his request for accommodation? Provide copies, with submission dates indicated.

    e. Did the Agency respond to this request? If so, what was the Agency's response? When did the Agency respond? Provide documentation, with dates indicated.

    f. Did the Agency grant the requested accommodation? If not, what was the Agency's reasoning for the denial? Provide documentation, with dates indicated.

9. Did the Agency fill any vacancies for which Complainant would have been qualified in between May 1, 2018 and February 12, 2019?

    a. Identify all GS-12 (or equivalent) vacancies filled in all DOI bureaus between May 1, 2018 and February 12, 2019 within the following occupational series:

        i. 1601: Facility Management Specialist

        ii. 1640: Facility Operations Specialist

        iii. 0343: Management Analyst (administrative, budget, and/or procurement)

        iv. 0341: Administrative Officer (administrative, budget, and/or procurement)

        v. 4749: Maintenance Supervisor

        vi. 1173: Housing Manager

        vii. 1176: Building Manager

        viii. 1101: Business Manager/Acquisition Program Manager (facilities)

    b. For each position identified:

        i. Ask Complainant:

            1. Could Complainant have performed this position within his medical limitations, with or without a reasonable accommodation?

            2. Would Complainant have accepted this position as a reassignment?

        ii. Ask the Agency:

            1. When did this position become vacant?

            2. Was this position offered to Complainant? If not, why was this position not offered to Complainant?

            3. Would the Agency have been able to reasonably accommodate Complainant in this position?

            4. Would reassigning Complainant into this position have caused the Agency an undue hardship?

10. Ask Complainant AND the Agency:

    a. What were the specific restrictions and criteria that the Complainant identified for his reassignment job search?

    b. When did Complainant identify these restrictions and criteria?

    c. All relevant documentation regarding Complainant's identified restrictions and criteria must be included in the Supplemental ROI, with dates indicated.

11. Did the Complainant's February 2019 reassignment job search include telework-eligible positions at other NPS or DOI locations? If not, why not?

12. Did the Agency fill any vacancies for which Complainant would have been qualified in between February 12, 2019 and September 17, 2019?

    a. Identify all GS-12 (or equivalent) vacancies filled in all DOI bureaus between February 12, 2019 and September 17, 2019 within the following occupational series:

23

      i. 1601: Facility Management Specialist
     ii. 1640: Facility Operations Specialist
    iii. 0343: Management Analyst (administrative, budget, and/or procurement)
    iv. 0341: Administrative Officer (administrative, budget, and/or procurement)
     v. 4749: Maintenance Supervisor
    vi. 1173: Housing Manager
   vii. 1176: Building Manager
  viii. 1101: Business Manager/Acquisition Program Manager (facilities)

b. For each position identified:
   i. Ask Complainant:
     1. Was Complainant offered this position?
     2. Could Complainant have performed this position within his medical limitations, with or without a reasonable accommodation?
     3. Would Complainant have accepted this position as a reassignment?
   ii. Ask the Agency:
     1. When did this position become vacant?
     2. Was this position offered to Complainant? If not, why was this position not offered to Complainant?
     3. Would the Agency have been able to reasonably accommodate Complainant in this position?
     4. Would reassigning Complainant into this position have caused the Agency an undue hardship?

13. Ask the Agency's Human Resources (HR) personnel involved with Complainant's original reassignment job search:

a. What is the typical process for a reassignment job search? All relevant documentation regarding the Agency's reassignment job search practices and procedures must be included in the Supplemental ROI.

b. What methodology did the Agency use to conduct Complainant's reassignment job search in February of 2019? All relevant documentation regarding Complainant's reassignment job search must be included in the Supplemental ROI, with dates indicated. This includes informal documentation, such as emails and instant messages.

c. Which bureaus did the Agency reach out to for Complainant's reassignment job search? All relevant communications between HR and the bureaus regarding Complainant's reassignment job search must be included in the Supplemental ROI, with dates indicated. This includes informal communications, such as emails and instant messages. For each bureau:
   i. What method did this bureau use to conduct Complainant's job search?
   ii. Who was the point of contact at this bureau responsible for conducting Complainant's job search?
  iii. When did this bureau respond? Provide documentation.
   iv. What was this bureau's response? Provide documentation.

d. Which two bureaus identified in ROI, Ex. F-9, p. 226 returned negative responses regarding Complainant's reassignment job search?

14. Ask Complainant AND the Agency: Did the Agency ever inform Complainant that he had the option of modifying his requested criteria if the reassignment job search was unsuccessful? If so:
    a. When did the Agency inform Complainant about this option? Provide documentation.
    b. Who informed Complainant about this option?
    c. What exactly did this individual tell Complainant? Provide documentation.
    d. Did Complainant respond? If so, when? What was Complainant's response? Provide documentation.

15. Ask Complainant AND the Agency: Did the Agency ever inform Complainant that his failure to modify the criteria for the reassignment job search could result in his removal for a medical inability to perform the essential functions of his position? If so:
    a. When did the Agency inform Complainant about this possibility? Provide documentation.
    b. Who informed Complainant about this possibility?
    c. What exactly did this individual tell Complainant? Provide documentation.
    d. Did Complainant respond? If so, when? What was Complainant's response? Provide documentation.

16. Ask Complainant AND the Agency: Did Complainant request to return to duty after receiving the Proposed Removal? If so:
    a. What was the exact substance of Complainant's request? Provide documentation.
    b. When did Complainant make this request? Provide documentation.
    c. To whom did Complainant make this request?
    d. Did Complainant receive a response to his request? If so, when? What was the response? Provide documentation.
    e. Was Complainant's request to return to duty denied? If so, when? Why was Complainant's request to return to duty denied? Provide documentation.

## VII.     Statement of Notice and Rights

## APPEAL RIGHTS TO THE MERIT SYSTEMS PROTECTION BOARD

29 C.F.R. § 1614.302(d)(3) states that an appeal of the Agency's final decision on a mixed case complaint to the Merit Systems Protection Board (MSPB) must be filed by an Appellant within thirty (30) calendar days after receiving this decision and, in connection with that Appeal, a hearing may be requested. Alternatively, in light of the fact that more than 120 days have elapsed since the filing of this complaint, Appellant may, pursuant to 29 C.F.R. § 1614.302(d)(1)(i), file an MSPB appeal prior to the issuance of this letter.

A Petition for Appeal shall be deemed filed on the date it is postmarked or, in the absence of a postmark, five days prior to receipt by the MSPB. If a Petition for Appeal is filed outside of the time limits provided, the Petition should include a Motion for Waiver of the Time Limit. This motion must contain evidence and argument showing good cause for the untimely filing.

If a hearing is desired, a request for a hearing must be filed with the Petition for Appeal. Failure to make a timely request for a hearing will result in a waiver of the right to a hearing. Failure to appear for a scheduled hearing without good cause will result in adjudication on the record.

An appeal should be addressed to the appropriate MSPB Regional or Field Office:

> Regional Director and Chief Administrative Judge
> Atlanta Regional Office
> 401 West Peachtree Street, NW., 10th Floor
> Atlanta, GA 30308-3519
> (AL, FL, GA, MS, SC, TN)

> Regional Director and Chief Administrative Judge
> Central Regional Office
> 230 South Dearborn Street, 31st Floor
> Chicago, IL 60604-1669
> (IL, IN, IA, KS [Kansas City], KY, MI, MO, OH, WI)

> Regional Director and Chief Administrative Judge
> Northeastern Regional Office
> 1601 Market Street, Suite 1700
> Philadelphia, PA 19103
> (CT, DE, ME, MD [except the counties of Montgomery and Prince George's], MA, NH, NJ [except counties of Bergen, Essex, Hudson, and Union], PA, RI, VT, WV)

> Regional Director and Chief Administrative Judge
> New York Field Office
> 26 Federal Plaza, Room 3137-A
> New York, NY 10278-0022
> (NJ [counties of Bergen, Essex, Hudson, and Union], NY, PR, and Virgin Islands)

> Regional Director and Chief Administrative Judge
> Washington, DC Regional Office
> 1901 S. Bell Street
> Suite 950
> Arlington, VA 22202
> (MD [counties of Montgomery and Prince George's], NC, VA, DC, and all overseas areas not otherwise covered)

> Regional Director and Chief Administrative Judge
> Western Regional Office
> 1301 Clay Street, Suite 1380N
> Oakland, CA 94612-5217 (AK, CA, HI, ID, NV, OR, WA, and Pacific overseas areas)

> Regional Director and Chief Administrative Judge

Denver Field Office
165 South Union Blvd., Suite 318
Lakewood, CO 80228-2211
(AZ, CO, KS [except Kansas City], MT, NE, NM, ND, SD, UT, WY)

Regional Director and Chief Administrative Judge
Dallas Regional Office
1100 Commerce Street, Suite 620
Dallas, TX 75242-9979
(AR, LA, OK, TX)

A copy of the MSPB appeal form is attached.

At the same time the Appellant files an appeal with the MSPB, he must also furnish a copy of the appeal to:

Erica White-Dunston, Director
U.S. Department of the Interior
Office of Diversity, Inclusion and Civil Rights
1849 C Street, N.W., Suite 4353
Washington, DC 20240

In or attached to the appeal to the MSPB, Appellant must certify the date and method by which service was made on the Agency.

## CIVIL ACTIONS

Instead of an Appeal to the MSPB, Appellant may file a civil action in an appropriate U.S. District Court within thirty (30) calendar days of receipt of this decision. If Appellant elects to file a civil action under Title VII of the Civil Rights Act of 1964, as amended, he must file with the appropriate United States District Court. If a civil action is filed, **Appellant must name as the defendant, Scott A. de la Vega, Assistant Secretary of the U.S. Department of the Interior, as the Defendant.** Failure to do so may result in the loss of any judicial redress to which the Appellant may be entitled.

If the Appellant decides to file a civil action and is unable to afford counsel, the Civil Rights Act gives the Court discretionary authority to appoint counsel without payment of fees or costs by the Appellant. The granting or the denial of the request is within the sole discretion of the Court. The request and the civil action must be filed within ninety (90) days of the date the final decision is received.

Please note that, "filing a civil action under 29 C.F.R. §1614.408 or 29 C.F.R. §1614.409 shall terminate the Administrative processing of your complaint. If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the MSPB and/or EEOC in writing."

Sincerely,

_____            _____
Erica D. White-Dunston, Esq.                                          03/11/2021
Director and Chief Diversity Officer                              Date
Office of Diversity, Inclusion and Civil Rights

Encl.:  2020 COVID-19 Processing Information for EEO Directors, dated April 6, 2020.
         2020 COVID-19 Processing Information for EEO Directors, dated July 26, 2020.
         Posting Order

CC:     Rose Blankenship, EEO Director, NPS

28



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Office of Federal Operations**

**P. O. Box 77960**

**Washington, D.C. 20013**

April 6, 2020

<u>Memorandum</u>

TO:        Federal Sector EEO Directors & Officials

FROM:   Carlton M. Hadden
            Director, Office of Federal Operations

SUBJECT:   Processing Information for All Parties in Federal EEO Processing under 29 CFR Part 1614

In light of the National Emergency declared by the President due to the Coronavirus (COVID-19), the U.S. Equal Employment Opportunity Commission's (EEOC) Office of Federal Operations (OFO) is issuing the following instructions regarding the processing of federal sector EEO complaints covered by 29 CFR Part 1614.

The EEOC recognizes this crisis affects all federal employees, complainants, and others involved in the EEO process. We appreciate the dedication of federal EEO professionals throughout the federal government and we further recognize that the centerpiece of our efforts are the employees, applicants, and former employees who believe they have experienced employment discrimination and access our regulatory process for assistance. Nevertheless, the federal government remains open and committed to providing mission-critical services to the greatest extent possible, given the limitations inherent in the current environment.

The EEOC also recognizes that, because of the National Emergency, applicants who utilize the EEO complaint process may face challenges that preclude them from meeting the regulatory timeframes set forth in 29 CFR Part 1614.

The EEOC must balance its duty to ensure that the EEO process continues efficiently and effectively, without compromising the safety of federal employees or the rights or safety of complainants and others involved in the EEO process.

The EEOC expects that agencies and employees will continue to process EEO complaints in a timely manner that will best preserve the legal rights of the parties involved, unless doing so would interfere with mission-critical operations for an agency. Accordingly, the Office of Federal Operations is issuing the following instructions, which will remain in effect until further notice:

1. Agencies will continue all counseling, investigations and other complaint processing set forth in 29 CFR Part 1614, except in circumstances meeting the criteria described below.

2. To the extent practicable, regulatory timeframes concerning the processing of federal sector EEO complaints will continue to be met, wherever feasible. For this purpose, practicable means where the agency and complainant have access to needed witnesses, documents and representation, and where such processing will not interfere with the mission- critical operations of the agency.

3. The regulatory timeframes set forth in 29 C.F.R. Part 1614 will be subject to the equitable tolling provisions set forth in 29 C.F.R. §1614.604(c). Absent mutual agreement, <u>agencies and complainants will be required to document in the record the reason(s) why tolling any of the time limits set forth in 29 CFR Part 1614 is necessary.</u> Such justification will fully be considered by the Commission in any appeal raised in the matter.

4. Agencies and complainants are encouraged to seek mutual agreement with respect to the extension of any timeframes. Where such agreements are reached, they should be reduced to writing and made part of the record. OFO will honor such agreements on appeal, unless they are clearly onerous to one party or otherwise violate the standards for equitable tolling, waiver or estoppel.

5. EEOC Administrative Judges will continue to manage the hearings program. Administrative Judges will continue to hold conferences, manage discovery, refer cases to ADR and settlement, issue summary judgment decisions and, where appropriate, hold hearings and issue decisions. In light of the National Emergency, either party can seek an extension or other relief from any deadline for good cause shown.

6. The EEOC is deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. We ask agencies not to issue final actions on any EEO complaint, unless the investigation is complete <u>and</u> the Complainant has requested that the final action be issued.

7. EEOC will continue to prepare appellate decisions but will not mail those decisions. A Complainant who provides an e-mail address and waives first class mailing may request the decision via e-mail to <u>ofo.eeoc@eeoc.gov</u> . The Commission is extremely cognizant of preserving a party's right to file a civil action in U.S. District Court. Given the current National Emergency, the Commission is suspending issuance of all appellate decisions via the U. S. mail until further notice in order to best preserve those rights.

8. Until further notice, OFO does not have access to U.S. Mail; rather, we ask that all submissions and communications from both agencies and complainants be digital, via the Public Portal/FEDSEP. We ask those who submitted items via U.S. Mail on or after March 6, 2020 to resubmit them via the Public Portal/FEDSEP.

9. The Commission supports and encourages the use of digital documents and electronic signatures. A digital document used by a person, agency, or other entity shall have the same force and effect as those documents not produced by electronic means. "Electronic signature" means any digital symbol, sound, or process attached to or logically associated with a digital record and executed or adopted by a person with the intent to sign the record.

10. Each agency subject to the regulations at 29 CFR Part 1614 is directed to forward a copy of this notice, using the most effective available method, to each Complainant with a pending EEO matter and to each person who hereafter contacts an agency EEO counselor or otherwise enters into the agency's EEO process.

11. For more Commission information and resources, please go to our COVID-19 information links at: https://www.eeoc.gov/coronavirus/



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P. O. Box 77960**
**Washington, D.C. 20013**

<u>Memorandum</u>

TO:          Federal Sector EEO Directors & Officials

FROM:      Carlton M. Hadden
             Director, Office of Federal Operations

SUBJECT:   Update – April 6, 2020 Memorandum on Processing Information

We issued a memorandum dated April 6, 2020 regarding the processing of federal sector EEO complaints covered by 29 CFR Part 1614 in consideration of the National Emergency. The memorandum is attached for your ease of reference.

The EEOC reiterates its appreciation of the critical work of federal EEO professionals during this time of challenge due to the Coronavirus (COVID-9). Your dedication is essential to ensuring access to the federal sector EEO process for all who need to utilize it.

The EEOC previously recognized that, because of the National Emergency, applicants who utilize the EEO complaint process might have faced challenges that precluded them from meeting the regulatory timeframes set forth in 29 CFR Part 1614.

Using phased approaches, several agencies and organizations have resumed fuller operations. EEOC believes that there are now fewer issues related to access to counsel and the Courts, and that further delays could negatively impact applicants' ability to protect and exercise their rights effectively.

Therefore, we are adjusting three of the instructions set forth in the April 6, 2020, memo. As discussed in further detail below, EEOC is instructing agencies to return to issuing final actions in the usual manner, unless there are compelling reasons not to do so. Effective Monday, July 27, 2020, EEOC will also expand its issuance of appellate decisions.

Instruction 6 provided as follows:

> *The EEOC is deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. We ask agencies not to issue final actions on any EEO complaint, unless the investigation is complete, <u>and</u> the Complainant has requested that the final action be issued.*

Instruction 7 provided as follows:

*EEOC will continue to prepare appellate decisions but will not mail those decisions. A Complainant who provides an e-mail address and waives first class mailing may request the decision via e-mail to ofo.eeoc@eeoc.gov . The Commission is extremely cognizant of preserving a party's right to file a civil action in U.S. District Court. Given the current National Emergency, the Commission is suspending issuance of all appellate decisions via the U. S. mail until further notice in order to best preserve those rights.*

Instruction 8 provided as follows:

*Until further notice, OFO does not have access to U.S. Mail; rather, we ask that all submissions and communications from both agencies and complainants be digital, via the Public Portal/FEDSEP. We ask those who submitted items via U.S. Mail on or after March 6, 2020 to resubmit them via the Public Portal/FEDSEP.*

The Instructions, noted above, are modified as follows:

Instruction 6 as modified, follows:

*The EEOC remains deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. Agencies should return to issuing final actions.*

Instruction 7 as modified, follows:

*EEOC is expanding issuance of appellate decisions. While the complainant may receive the appellate decision via U.S. Mail, a complainant who has an account with EEOC's Public Portal, may waive receipt via U.S. Mail, and receive the decision via the EEOC Public Portal. Please note that there may be delays in the issuance of decisions sent by first class mail depending on staff access to EEOC's headquarters. Federal agencies will receive the appellate decision via the FedSEP digital platform.*

Instruction 8 as modified, follows:

*While OFO has limited access to U.S. Mail; parties are encouraged to utilize the Commission's digital platforms, such as the EEOC Public Portal or FedSEP, to communicate with OFO.*

With the exceptions of the modifications noted above, the Instructions as set forth in the April 6, 2020 memorandum continue to remain in effect.

Each agency subject to the regulations at 29 CFR Part 1614 is directed to forward a copy of this update and notice, using the most effective available method, to each Complainant with a pending EEO matter and to each person who hereafter contacts an agency EEO counselor or otherwise enters into the agency's EEO process.



United States Department of the Interior

OFFICE OF THE SECRETARY

OFFICE OF CIVIL RIGHTS

Washington, DC 20240

## NOTICE TO EMPLOYEES POSTED BY ORDER OF THE
## U.S. DEPARTMENT of the INTERIOR
### An Agency of the United States Government

This Notice is posted pursuant to an order by the United States Department of the Interior dated March 12, 2021 which found that a violation of the Rehabilitation Act has occurred at U.S. Department of the Interior (DOI), National Park Service, Chickamauga and Chattanooga Military Park, Chattanooga, Tennessee (hereinafter Facility).

Federal law prohibits discrimination against any employee or applicant for employment because of disability with respect to hiring, firing, promotion, compensation, or other terms, conditions or privileges of employment.

It was determined that the Facility violated the Rehabilitation Act with when it failed to provide reasonable accommodations to an individual with a disability. The Facility was ordered to: provide the individual with reasonable accommodations; provide Rehabilitation Act training to the responsible management officials and other personnel; and post this notice.

The Facility will ensure that officials responsible for personnel decisions and terms and conditions of employment will abide by the requirements of all Federal equal employment opportunity (EEO) laws and will not retaliate against employees who file EEO complaints.

The Facility will comply with Federal law and will not in any manner restrain, interfere, coerce, or retaliate against any individual who exercises his or her right to oppose practices made unlawful by, or who participates in proceedings pursuant to, Federal EEO law.

Duly Authorized Agency Representative: _____

Date Posted: _____

Posting Expires: _____

29 C.F.R. § 1614